UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID RIVERA,<br><br>                        Plaintiff,<br><br>-against-<br><br>NEW YORK CITY DEPARTMENT OF EDUCATION, CITY OF NEW YORK, CLAUDETTE CHRISTIE, former Principal of World Academy for Total Community Health (WATCH) High School; ARIANNA LEWIS, Assistant Principal for Thomas Jefferson Campus,<br><br>                        Defendants. | **COMPLAINT**<br><br>**ECF CASE**<br><br>21 Civ. \_\_\_ ( )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff DAVID RIVERA, by his attorneys, GLASS HARLOW & HOGROGIAN LLP, as and for his Complaint against Defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff Rivera brings this action seeking monetary and equitable relief based upon Defendants' violations of 42 U.S.C. Section 1983 and New York Civil Service Law Section 75-b (hereinafter "CLS § 75-b") as a result of maltreatment and retaliatory actions taken against him after he raised matters of a public concern regarding wrongdoings and fraud in the WATCH High School (Thomas Jefferson Campus) Athletic Department while serving as an Assistant Principal and former Athletic Director employed by Defendant New York City Department of Education ("NYCDOE"). Plaintiff also brings this action under the New York State Human Rights Law and New York City Human Rights Law based on race and

1

gender discrimination by Defendants, including instances of sexual harassment by his principal Claudette Christie.

2. Plaintiff seeks economic, compensatory damages and punitive damages to the extent allowable by law, and other appropriate legal and equitable relief pursuant to federal and state and city law.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 as this matter involves federal questions.

4. This action's venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391, because Plaintiff is employed as Assistant Principal for the New York City Department of Education in Brooklyn, New York.

5. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6. This Court has supplemental jurisdiction over Plaintiff's state and city law claims under 28 U.S.C. § 1367(a).

## PARTIES

7. Plaintiff is a resident of the County of Nassau and the State of New York.

8. At all times relevant herein, Plaintiff was a "public employee" of Defendant NYCDOE within the meaning of New York State Civil Service Law § 75-b(1)(b).

9. At all times relevant herein, Defendant New York City Department of Education ("NYCDOE") is a city school district established under the laws of the State of New York and Mr. Rivera's employer.

10. At all times relevant herein, Defendant Claudette Christie was the principal for World Academy of Total Community Health ("WATCH") High School within District 19 in Brooklyn. She is sued in both her official and individual capacity.

11. Defendant Claudette Christie (hereinafter "Principal Christie") began working at WATCH High School in September 2013. Upon information and belief, she is African American. Upon information and belief, she retired on or about August 2021.

12. At all times relevant herein, Defendant Arianna Lewis (hereinafter "AP Lewis") is an itinerant assistant principal of security for Thomas Jefferson Campus, which houses four small high schools, including WATCH High School. She is sued in both her official and individual capacity. Defendant AP Lewis began working at Thomas Jefferson Campus in September 2010. Upon information and belief, she is African-American. She became the Athletic Director for the Thomas Jefferson Campus on October 26, 2018.

## STATEMENT OF FACTS

13. Mr. Rivera has been employed with the NYCDOE since February 2005.

14. Mr. Rivera began working at WATCH High School in Brooklyn as a Social Studies Teacher in September 2006, and was promoted to Assistant Principal in August 2014.

15. As an Assistant Principal, Mr. Rivera had various duties, including, but not limited to, instructional supervision and support, master scheduling and programming, and student recruitment.

16. From October 2010 until October 2018, Mr. Rivera was also appointed as the Public Schools Athletic League ("PSAL") Athletic Director for the Thomas Jefferson Campus.

17. The PSAL Athletic Director is a per session compensated position.

18. In the position of Athletic Director, Mr. Rivera was responsible for implementing and enforcing the PSAL guidelines, overseeing the quality and compliance of the athletic program, supervising home athletic contests and/or arranging for proper supervision of home athletic contests by administrative personnel, supervising the department, and representing the school in all matters related to athletics.

**Race Discrimination**

19. In 2015 and 2016, Principal Christie stated on several occasions to Mr. Rivera that "[he was] the only White guy in the world that [she] trust[s]". Notably, Mr. Rivera is Caucasian/Hispanic.

20. In late February 2017, Principal Christie informed Mr. Rivera while in his office of an argument she had with Principal James Anderson, the principal at FDNY High School, which is one of the four high schools as part of the Thomas Jefferson campus. Specifically, Principal Christie stated that Principal Anderson was "incompetent and racist." She further stated that Mr. Rivera needed to separate himself from Principal Anderson and resign from his Athletic Director position if he ever wanted to grow in his profession and become a principal.

21. Principal Anderson is Caucasian and was also Mr. Rivera's supervisor in the PSAL program for 8 years when he was Athletic Director.

22. In response to Principal Christie's statements, Mr. Rivera stated that he felt "it was unfair to be stuck in the middle of two battling Principals and asking [him] to resign from work that [he] enjoy[s]". Her response was "you know, I have a feeling if I were a White man you would listen to my recommendation."

23. In September 2017, on various occasions, Principal Christie told Mr. Rivera and his colleagues that it was time for him to resign as the Athletic Director and he should be replaced by AP Lewis.

24. Starting in the 2017-18 school year, Principal Christie instituted a pattern of disparate treatment towards non African American staff members. For instance, Ms. Tina Stevens, art instructor, Mr. William Karl, social studies teacher, and Mr. Anthony Esposito, social studies teacher, were given less support and/or scrutinized more closely than similarly situated African American instructors, and ultimately transferred from the school by June 2018 after Principal Christie targeted them. Mr. Ken Rugen, physical education and health teacher, was intimidated into obtaining a different teaching credential in November 2017, set up for poor observation ratings by Principal Christie in March 2018, provided fewer opportunities to earn a higher instructional rating compared to a similarly situated African American teacher Denise Palmer, and was ultimately excessed from the school in June 2019. Ms. Mary Modica, an English as Second Language (ESL) teacher, was discontinued in July 2019 and is now pursuing a federal discrimination case against Principal Christie. Additionally, Principal Christie discouraged Mr. Rivera in writing from providing adequate instructional support to Mr. Karl on March 15, 2018, and Ms. Modica on March 31, 2019. All of the above were Caucasian teachers. As a result, the Caucasian teaching staff at WATCH High School, which represented 25 percent of the faculty in September 2016, represented zero (0) percent of the faculty by October 2019. On the contrary, only one Black faculty member has left the school in the same time period.

25. From December 2017 to January 2018, parents of the basketball community sent email complaints with baseless accusations against Mr. Rivera, alleging that he treated

Black staff whom he supervised differently than White staff. Copied on these emails were superintendents, local politicians, the Chancellor, coaches under Mr. Rivera's supervision, students, teachers, and parents. The DOE's Office of Special Investigation (OSI) investigated the matter and concluded in March 2018 that all complaints against Mr. Rivera were unsubstantiated, which Mr. Rivera received notice of by email.

26. After learning of these baseless complaints in late 2017, Mr. Rivera informed Principal Christie that he believed these complaints were initiated by AP Lewis because the text of the complaints matched verbatim with statements made by AP Lewis in other internal emails between administrators. Principal Christie, however, ignored Mr. Rivera's comments and refused to investigate the matter against AP Lewis.

27. On December 11, 2017, Mr. Rivera emailed Defendant NYCDOE's Office of Equal Opportunity ("OEO") to report AP Lewis's harassment towards him. To date, there has been no substantive action by OEO to investigate Mr. Rivera's complaint.

28. On January 2, 2018, Mr. Rivera emailed Principal Christie and Principal Anderson objecting to the complaints initiated and encouraged by AP Lewis against him, and asking for accountability against AP Lewis. However, while Principal Anderson continued to support Mr. Rivera, Principal Christie continued to ignore Mr. Rivera's complaints against AP Lewis and refused to take any action against her.

**Mr. Rivera's Initial Complaints to Investigative Bodies**

29. On or about January 2018, Mr. Rivera learned in a local online newspaper that Coach Lawrence Pollard, Thomas Jefferson Basketball Head Coach, used a false home address for certain students wishing to transfer into the Thomas Jefferson Campus in Brooklyn, as Thomas Jefferson had a top-rated basketball program. Mr. Rivera learned that

three students over the course of two school years had used the same Brooklyn address, while in fact they were residing in different districts in Long Island and Brooklyn.

30. The next day, January 5, 2018, Mr. Rivera reported the students' school transfer fraud via an alias to PSAL Athletic Director Donald Douglas via email. In the report, Mr. Rivera noted Coach Pollard's involvement in the students' school transfer fraud.

31. On or about February 12, 2018, Mr. Rivera also reported Coach Pollard's misconduct to the NYC Office of Special Investigation ("OSI") via an alias regarding the students' school transfer fraud. Mr. Rivera also emailed further information under the alias about Coach Pollard's misconduct to the NYC Special Commissioner of Investigation ("SCI") investigators on March 1, 2018, March 7, 2018, and March 19, 2018.

32. On March 11, 2018, Mr. Rivera verbally informed Principal Christie that he discovered Coach Pollard's violations of NYCDOE transfer rules, and that Coach Pollard was under investigation for this. In response, Principal Christie stated that Mr. Rivera had "no business reporting [about Pollard] because it was a year-old problem, students already graduated."

**Removal as Athletic Director, Continued First Amendment Retaliation and Race Discrimination**

33. During a meeting with Principal Christie on or about October 25, 2018, Mr. Rivera informed Principal Christie that Michael Steele, Principal of the High School for Civil Rights, which is part of the Thomas Jefferson campus, was engaged in grade-changing fraud. Specifically, on or about November 10, 2017, Mr. Rivera had previously informed Coach Pollard that his starting point guard was academically ineligible due to a failing grade on his transcript, which had been entered in June 2017. Mr. Rivera then noticed that within a week

of receiving the news--and five months after the grade had been entered and from a prior school year--the student's grade was changed from failing to passing. However, it was not until October 2018 that Mr. Rivera understood this conduct to have constituted fraud by Coach Pollard and Principal Steele. In response, Principal Christie told Mr. Rivera to let his concerns about this go and focus on trying to become a principal instead.

34. Additionally, during the October 25th meeting, Mr. Rivera expressed to Principal Christie his concerns about AP Lewis' potential knowledge of Coach Pollard's wrongdoings, since AP Lewis was listed on the PSAL Website as a Volunteer Assistant Coach for Coach Pollard for several years.

35. After the October 25th meeting with Principal Christie, Mr. Rivera reported the grade changing/fixing of student athletes' grades by Principal Steele via email to OSI. OSI acknowledged receipt of Mr. Rivera's complaint on December 13, 2018, and Mr. Rivera later came to learn that Principal Steele ultimately was forced to resign his position from the DOE by June 2019. Principal Steele had been Coach Pollard's supervisor as Coach Pollard was a gym teacher in his school.

36. Several hours after his October 25th complaint to OSI, Mr. Rivera learned during a phone call from Principal Anderson that he was being removed from his position of Athletic Director and that his replacement was AP Lewis.

37. When he was subsequently called into a 1 to 1 meeting with Principal Christie after his removal as Athletic Director, Principal Christie stated that "it was time for [him] to let the PSAL thing go" and "it is time for a Black woman to have this small opportunity."

38. Principal Christie often made misguided comments to staff about racial equity in the schools. For instance, Jefferson Campus Computer Technician Ron Saunderson, who is

8

African American, reported to Mr. Rivera in November 2019 that while he was overwhelmed by being the only full time technician in the building, Principal Christie told him "if there were White children in this school or if I were a White leader, that job would have been completed faster".

**First Amendment Protected Speech to PSAL**

39. In February 2019, PSAL audited the Thomas Jefferson campus Athletic Department. On February 14, 2019, PSAL Auditor Mark Mallor contacted Mr. Rivera regarding the audit. During this conversation Mr. Rivera informed Mr. Mallor that AP Lewis was allowing academically ineligible student-athletes to play in basketball games.

40. Later that day, Principal Christie stated to Mr. Rivera that he was "sabotaging" the Athletic Department by making this report to PSAL, and that he was hurting kids by speaking with the auditors.

41. On March 5, 2019, in blatant retaliation for Mr. Rivera's report to PSAL, Principal Christie issued Mr. Rivera his first ever disciplinary letter to file regarding leaving work early in November 2018, after a meeting held on this issue in December 2018.

42. Mr. Rivera subsequently grieved the issuance of this letter, and Principal Christie agreed that had it to be removed from his file due to its untimeliness. However, in May 2019, Mr. Rivera learned in a subsequent tenure extension rationale letter that Principal Christie had backdated the March 5th disciplinary letter to February 28, 2019, and placed it in his personnel file anyway to justify his extension of probation.

43. On March 22, 2019, Mr. Rivera met with Principal Christie for a disciplinary conference related to his communications to the PSAL auditor.

44. On April 2, 2019, Principal Christie issued Mr. Rivera a disciplinary letter relating to his communications with the PSAL auditor. Specifically, Principal Christie stated that Mr. Rivera "neglected to actively supervise [his] class in order to await the arrival of the auditor [...]" and that "[he] knowingly and willingly provided documents (students' records) to the auditor in order to influence the outcome of the PSAL audit."

45. Mr. Rivera disputed the allegations in this disciplinary letter. Notably, a 30-minute video from a school camera showing him speaking to the auditor on February 14, 2019, showed that he only spoke to the auditor for about one minute, and that he supervised his class in accordance with the school handbook policy. Notably, the video also showed Ms. Welch, an African American teacher who taught Special Education Math across the hall from Mr. Rivera, leaving her classroom for over five minutes and entering the classroom next door. Ms. Welch, however, was not similarly disciplined by Principal Christie for not supervising her class properly.

46. On or about April 11, 2019, during another 1 to 1 conference, Principal Christie stated to Mr. Rivera "that it is inexcusable [he] ruined Mr. Steele's career and that to report this after [he] was dismissed as Athletic Director is inexcusable." Principal Christie also stated that Mr. Rivera "lacked character for telling on Mr. Steele because he was replaced as Athletic Director."

47. On April 16, 2019, Mr. Rivera received an extension of tenure letter and extension of probation agreement from Principal Christie with no rationale, which would extend his date to become tenured as an Assistant Principal.

48. On April 18, 2019, Mr. Rivera sent an email to Principal Christie informing her that Mr. Julius "Gus" Cyrus, School Janitor and the new head football coach for the

Jefferson Campus, was conducting illegal football practices outside the permitted PSAL calendar for practices.  Mr. Rivera also mentioned that Mr. Cyrus should not be permitted to coach students as he does not have the required credentials and had two incidents on record of him behaving in a sexually inappropriate way with students, including being investigated by SCI for a viral locker video showing him ordering student football players to give each other "lap dances" in order to receive their football equipment.   Principal Christie ignored Mr. Rivera's complaints.

49. Approximately one month later, on May 14, 2019, Principal Christie sent to Mr. Rivera a "Tenure Extension Rationale" letter, including reprimanding Mr. Rivera for complaining about Mr. Cyrus. In this letter, Principal Christie wrote false allegations against Mr. Rivera as pretextual reasons for extending his probationary period.  Notably, Principal Christie inaccurately states that Mr. Rivera reached out to Tene Williams of Human Resources to have his friends put on the Table of Organization, when in fact Mr. Rivera inquired about the process to add volunteers to his PSAL program.  Principal Christie also made a false statement about Mr. Rivera allowing coaches to leave work early without permission, although the early release form asks for the signature from the Principal or the Assistant Principal, suggesting that Assistant Principals have authority to approve this type of request. Additionally, Principal Christie falsely alleged that Mr. Rivera illegally collected per session compensation when there was no fixed schedule for an Athletic Director to fulfill his responsibilities, and that Mr. Rivera failed to meet his professional goal of raising student attendance, although this was not one of his published goals.

50. On June 12, 2019, Principal Christie informed Mr. Rivera by letter that he was being excessed from the WATCH  High school for the following school year.  However,

Principal Christie's excess attempt was not approved by the NYCDOE, and Mr. Rivera remained assigned to WATCH High School starting in late August 2019.

51. On June 13, 2019, Principal Christie issued Mr. Rivera a false disciplinary letter for illegally clocking in for per session compensation for PSAL activities on September 26, 2018, which was untrue. Mr. Rivera was justified to clock in on the date in question because PSAL activities occurred throughout the city, including for teams under Mr. Rivera's direct supervision. Principal Christie never attempted to verify this with DOE/PSAL central authorities before issuing this disciplinary letter.

**Administrative Reassignment During the 2019-2020 School Year and Continued Harassment**

52. By letter dated October 8, 2019, Mr. Rivera was notified that he was being administratively reassigned effective October 10, 2019. Since October 10, 2019, Mr. Rivera has been reassigned to a "rubber room" administrative office outside his school without any specific reason for his reassignment, nor has he been interviewed by any investigator as to why he is under investigation.

53. On April 25, 2021, Mr. Rivera received a blank email from AP Lewis replying to an email from Mr. Rivera dated December 1, 2017 with a quote under her signature saying "Satan himself masquerades as an Angel of Light", even though he had been removed from the school building for 19 months and had no contact with her.

54. On or about May 7, 2021, Mr. Rivera was informed by OSI investigators that he was being investigated for illegal recruiting of basketball players in June 2020. Mr. Rivera informed OSI investigator Camille Blake that he submitted allegations against Coach Pollard for the same charge and sent her evidence of the school transfer fraud. By email dated May

25, 2021, OSI informed Mr. Rivera that the charges against him were unsubstantiated and the matter would be closed, less than a week after he was interviewed by OSI.

**Gender Discrimination/Sexual Harassment**

55. In September 2016, at the end of a school day, Principal Christie asked Mr. Rivera if he was interested in taking her daughter out on a date. Surprised, Mr. Rivera declined, notably stating that he was too old for her daughter in order to get out of the conversation.

56. In February 2017, during an administrative meeting, Principal Christie again asked Mr. Rivera to take her daughter out on a date. She further stated that her daughter is a virgin, has never even been kissed, is going to be a doctor, and has saved all of her money over the years. Uncomfortable with this conversation initiated by Principal Christie, Mr. Rivera politely declined.

57. On January 19, 2018, Mr. Rivera's ex fiance, Ms. Sharlene Paulin, a former DOE employee, showed up unannounced to Mr. Rivera's office, requesting a meeting with Principal Christie so she could pitch her services as a contracted vendor with DOE. Mr. Rivera immediately called Principal Christie and expressed his concerns about the situation based on his relationship with Ms. Paulin. Principal Christie hired Ms. Paulin anyhow.

58. The next business day, on January 22, 2018, Principal Christie stormed into Mr. Rivera's office aggressively in tears claiming that she heard from Ms. Paulin that he referred to Principal Christie as "ugly, fat, old, and Black". Even though Mr. Rivera denied saying these comments, the argument lasted over an hour. During the argument, Mr. Rivera informed Principal Christie that he was dating a Black woman. She asked him to prove it by

13

calling her that moment and placing it on speakerphone. Mr. Rivera made the phone call in front of Principal Christie. After this meeting, Mr. Rivera noticed that he was removed from DOE systems as "Principal Designee" status, reducing his access levels to many pertinent systems.

59. Several weeks later, Mr. Rivera noticed that three of the schools in the building withdrew his access to electronic student academic records, making his ability to perform his Athletic Director responsibilities difficult.

60. On October 18, 2018, after a visit from a female mentor, Maureen Goldfarb, in a leadership program that Mr. Rivera was involved in, Principal Christie sent him an email accusing him of unprofessionalism for not meeting with Principal Christie upon his mentor's arrival. Principal Christie also threatened to deny Mr. Rivera tenure and adversely rate him.

61. In September 2019, after a visit from a female administrator colleague, Maria Maravegias, that was in the building to support a principal in another school, Principal Christie stormed into Mr. Rivera's office, alleging that he persuaded a student to phone in complaints about her to the Superintendent.

62. Four business days later, on October 7, 2019, Mr. Rivera was reassigned to essentially a "rubber room", and to this day he has yet to be told the reason or even interviewed about this situation by an OSI or SCI investigator.

63. On or about November 15, 2019, Mr. Rivera filed an SCI case about sexual harassment against Principal Christie towards him. On November 20, 2019, SCI confirmed receipt of his complaint. In September 2020, an OEO investigator contacted Mr. Rivera about the allegations, but no further action has been taken.

64. To date, Mr. Rivera has lost per session pay as Athletic Director since his removal in October 2018, per session summer pay, promotional opportunities, and has suffered medical, psychological, and legal out of pocket expenses.

**FIRST CLAIM FOR RELIEF**

**RETALIATION AGAINST PLAINTIFF FOR
EXERCISING FREEDOM OF SPEECH IN VIOLATION
OF PLAINTIFF'S FIRST AMENDMENT RIGHTS**
(against all Defendants)

65. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

66. While acting under color of State Law, Defendants violated Plaintiff's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to matters of public concern, specifically regarding fraud in the athletic department.

67. As a proximate result of Defendants' retaliatory actions against Plaintiff, he has suffered and continues to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

**RETALIATION IN VIOLATION OF
NEW YORK STATE CIVIL SERVICE LAW § 75-B**
(against all Defendants)

68. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

69. Plaintiff reported violations of federal and state law by the school administration, thereby engaged in a protected activity as defined in New York Civil Service Law § 75-b(2)(a).

70. Defendants had notice that Plaintiff participated in such protected activities.

71. Defendants retaliated against Plaintiff by engaging in adverse "personnel actions" against him as defined by New York Civil Service Law § 75-b(1)(d).

72. As a proximate result of Defendants' retaliatory actions against Plaintiff, he has suffered and continues to suffer a loss of past and future income, monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation, in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

**RACE AND GENDER DISCRIMINATION AND RETALIATION UNDER NEW YORK STATE HUMAN RIGHTS LAW**
**(against all Defendants)**

73. Plaintiff repeats and realleges each and every allegation contained above, inclusive, with the same force and effect as if more fully set forth herein.

74. Plaintiff has been discriminated and retaliated against based on his race and gender and been subject to racial and sexual harassment under the New York State Human Rights Law.

75. Mr. Rivera has suffered increased anxiety, depression, and emotional distress that has resulted in him having to see a therapist on bi-weekly basis since the 2018-19 school year. He is red flagged in the DOE system, and reassigned from his school. He is not permitted to attend professional development, earn per session, or interview for other opportunities. He

16

has been under investigation since October 2019. His reputation has been extremely tarnished, and his career advancement is stalled.

**FOURTH CLAIM FOR RELIEF**

<u>**RACE AND GENDER DISCRIMINATION AND RETALIATION UNDER NEW YORK CITY HUMAN RIGHTS LAW**</u>
**(against all Defendants)**

76. Plaintiff repeats and realleges each and every allegation contained above, inclusive, with the same force and effect as if more fully set forth herein.

77. Plaintiff has been discriminated and retaliated against based on his race and gender and been subject to racial and sexual harassment under the New York City Human Rights Law.

78. Mr. Rivera has suffered increased anxiety, depression, and emotional distress that has resulted in him having to see a therapist on bi-weekly basis since the 2018-19 school year. He is red flagged in the DOE system, reassigned from his school. He is not permitted to attend professional development, per session, or interview for other opportunities. He has been under investigation since October 2019. His reputation has been extremely tarnished, and his career advancement is stalled.

**JURY DEMAND**

Plaintiff hereby demands a trial by Jury.

# **PRAYER/DEMAND FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor against Defendants as follows:

a. Judgment declaring that Defendants acts violated Plaintiff's rights as secured by federal and state law prohibiting retaliation in employment;

b. Enjoining Defendants from any further acts adversely affecting the terms and conditions of Plaintiff's employment including his compensation and privileges;

c. Compensatory damages to compensate Plaintiff for economic loss, damage to name, profession, career and reputation, pain and suffering, emotional distress and mental anguish, embarrassment, indignity, and dislocation, in an amount to be determined at trial;

d. Punitive damages against one or all of the Defendants;

e. Statutory attorneys' fees, interest, costs, and disbursements, and

f. For such other and further legal, equitable or other relief as the Court deems just and proper.

DATED:  New York, New York
        November 3, 2021

                    GLASS HARLOW & HOGROGIAN LLP
                    85 Broad Street, 16th Floor @ WeWork
                    New York, NY 10004
                    (212) 537-6859

                By: s/ Bryan Glass
                    BRYAN GLASS, ESQ.